[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE
The defendant, Arthur Andersen LLP ("Andersen"), has moved to strike the Fourth and Fifth Counts of the Complaint for failure to state a claim upon which relief can be granted. Specifically, the defendant argues that the Fourth Count, which purports to assert a claim for deceit, fails to allege the necessary elements of fraud and the Fifth Count fails to allege a cognizable claim for a violation of the Connecticut Unfair Trade Practices Act. Connecticut General Statutes §§ 42-110b et seq. ("CUTPA"), because the plaintiffs have alleged only a claim of professional negligence. which does not support a CUTPA claim. CT Page 9212
 Allegations of the Complaint
The pertinent allegations of the Complaint are summarized as follows: The plaintiffs are The Advest Group, Inc. ("AGI"), Advest, Inc. ("Advest"), Delaware corporations, Billings Co., Inc. ("Billings") and Billings Management Company ("BMC"), Connecticut corporations all having their principal place of business in Hartford, Connecticut. Advest and Billings are wholly-owned subsidiaries of AGI. BMC is a wholly owned subsidiary of Billings. The defendant is Andersen, an Illinois partnership with its Connecticut operations based in Hartford, Connecticut. Andersen is a business unit of Arthur Andersen Worldwide Organization and is the largest accounting firm in the world. ¶¶ 1-5.
Jonathan Googel and Benjamin Sisti formed Colonial Realty in the mid 1960s to manage and own real estate. In the 1970's Colonial began syndicating real estate limited partnerships. In the early 1980's Frank M. Shuch was hired as Colonial's chief financial officer after he had been dismissed as an employee of Broad Reach Inc. allegedly for embezzling. ¶ 8. As an inducement to investors Googel, Sisti, Shuch and another Colonial principal, William Candelori (collectively the Colonial General Partners') would guarantee operating shortfalls and cash distributions to investors for a given period of time, usually ten years. ¶ 10.
Between 1984 and 1990 Andersen worked intimately with Colonial and the Colonial General Partners in the syndication of eighteen real estate limited partnerships including Advest/Colonial Chatfield Limited Partnership and Advest/Colonial Tamarac Limited Partnership (the "Andersen Partnerships"). ¶ 12. Andersen represented to investors and Plaintiffs that it performed its Colonial work as an independent accounting firm as defined by the rules of conduct of the AICPA. This was false. ¶ 13.
David Federman, an Andersen partner who headed the Tax department in Hartford, was married to Shuch's sister. This relationship created an inference of impropriety and was a conflict of interest under the rules of the SEC. Andersen was aware of the conflict but took no steps to resolve it. ¶ 14. Between 1982 and 1990 Federman received $150,000 to 200,000 in cash from Shuch and/or Colonial plus other valuable gifts. ¶ 15. CT Page 9213
Loans and gifts were given by Colonial to Edmund Autuori, Andersen's Colonial engagement manager and a current tax partner, between 1986 and August 1990. ¶ 17. Autuori mainlained an office at Colonial's headquarters in West Hartford. ¶ 18. Andersen improperly assisted Colonial in selling and promoting its offerings. Richard McCardle, an Andersen partner, had investors call him for explanations of Andersen's work product and attended meetings with Colonial's sales force. Autuori participated directly in sales to investors and attended sales presentations and accompanied salespersons to calls to investors on a regular basis. ¶ 19.
Andersen performed detailed financial analysis of various properties owned by Colonial which had been purchased from the Travelers Insurance Company in the summer of 1989 ("Travelers Guide 5 Analysis). Comparison of that report with previous forecasts done by Andersen revealed that for the period January 1, 1987 to September 1, 1989 actual financial results typically were dramatically less than forecast. ¶ 23. Andersen also knew or recklessly disregarded the fact that in various Colonial partnerships no cash flow payments to limited partners were ever made from operating cash flow. Disclosure of the source of limited partners' distributions would have indicated that earlier formed partnerships were funded with cash raised in subsequent partnerships. Disclosure of the source of funds used by Colonial to make distributions to limited partners and fund operating losses and cash flow deficiencies would have revealed the existence of a pyramid or Ponzi scheme whereby Colonial was using monies raised from subsequent offering to cover the obligations of previously syndicated partnerships. ¶ 25.
In mid-September, 1989 Andersen determined that there was a $3,219,000 variance between the net operating income set for in the Constitution Plaza forecast and the actual experience. ¶ 36. In February 1990 Touch Ross, another accounting firm, advised Colonial and Andersen that Colonial would soon run out of money to meet current obligations. Andersen did not disclose this to the plaintiffs. ¶ 37. In March, 1990 Andersen knew that Colonial had various problems with Constitution and did not disclose these facts to the public, or the plaintiffs. ¶ 38.
On May 17, 1988 Advest entered into an agreement with the Colonial General Partners to commence acquiring and syndicating real estate. The first property to be jointly syndicated was Quail Oaks, Tamarac, Florida. ¶¶ 39, 40. On or about September CT Page 9214 5, 1988 Advest executed an agreement with Advest/Colonial Tamarac Limited Partnership, BMC, wherein Advest became the selling agent for Tamarac. ¶ 44. On Nov. 30, 1988, the Tamarac offering was complete and fully subscribed and on December 15, 1988 the breaking of limited partners' escrow funds was authorized. ¶ 48.
In January, 1989 BMC entered into a partnership agreement with Colonial USA regarding the Chatfield limited partnership. Chatfield was to own a congregate care facility which was to be constructed in West Hartford, Connecticut. ¶ 54. Throughout 1989 groups of prospective Chatfield investors were approved periodically for admission to the partnership and authorization was given to break the limited partners' escrow. In December, 1989 the Chatfield offering was complete and the escrow was broken on the last group of investor funds. ¶ 58.
On or about November 9, 1989. the Offering Circular for the Advest/Chatfield zero coupon bond offering was issued. Over the course of the next eight months, prospective bond investors were approved for the investment and approximately $1,000,000 was raised for Chatfield. ¶¶ 62 and 63.
In March, 1989, Andersen issued a report to Colonial USA and provided a copy to the plaintiffs in which it said that as of December 31, 1988 no events had occurred that triggered the obligations of Colonial USA or its shareholders under the guarantees. Andersen failed to disclose that Colonial General Partners had been funding a guarantee for Royce Inn in Fort Lauderdale since 1987. ¶ 59.
Andersen knew that its intimate relationship with Colonial created an egregious conflict of interest with the plaintiffs, but it failed to notify the plaintiffs of the conflict. If the plaintiffs had known about the conflict then they would not have agreed to be general partners in Tamarac or Chatfield. ¶ 72. If Andersen had timely advised about the Colonial general partners' precarious financial position, or the variations between forecasted performance and actual performance of the partnerships, the plaintiffs would not have become involved in Tamarac or Chatfield. ¶ 73.
The Fourth Count of the Complaint. entitled "Deceit", incorporates the allegations set forth above and further alleges that as a certified public accounting firm and by the demands of CT Page 9215 good faith and common honesty Andersen had a duty to either disaffirm or update an opinion upon which it knew others were still relying upon discovering facts demonstrating that the underlying financial statement or opinion was inaccurate, false or misleading. Paragraphs 95 through 97 contain similar allegations of the defendant's duty to disaffirm or update its reports concerning the Tamarac and Chatfield offerings, audit reports issued to Colonial USA and BMC, opinions issued with respect to the obligations of AGI and BMC as they related to potential liabilities as general partners of Tamarac and Chatfield. Paragraph 99 states:
 As a consequence of Andersen's deceitful conduct, the plaintiffs agreed to and completed the syndication of Tamarac, agreed to and completed the syndication of Chatfield, and proceeded with and closed the Chatfield Zero Coupon Bond Offering.
The Fifth Count of the Complaint, entitled "CUTPA", alleges that Andersen engaged in unfair or deceptive acts by not disclosing to the plaintiffs an egregious conflict of interest and I continuing to provide accounting services and receiving significant fees for those services while knowing or recklessly disregarding Colonial's precarious financial condition and failing to disclose that condition to the plaintiffs. ¶ 102. This is the only paragraph of the Fifth Count which describes the alleged violation of CUTPA with any specificity. The remainder of the allegations merely identify "Andersen's conduct in connection with its engagement with AGI and the Tamarac, Chatfield, and Constitution Plaza syndication," as the basis of the alleged unfair and deceptive conduct.
 Discussion of Law and Ruling
The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book § 10-39 (formerly § 152); Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432
(1989); Mingachos v. CBS, Inc., 196 Conn. 91, 108, 491 A.2d 368
(1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. Liljedahl Bros., Inc. v.Grigsby, 215 Conn. 345, 348, 576 A.2d 149 (1990); Blancato v.Feldspar Corp. , 203 Conn. 34, 36, 522 A.2d 1235 (1987).
The court should view the facts in a broad fashion, not strictly limited to the allegations, but also including the facts CT Page 9216 necessarily implied by and fairly probable under them. Dennisonv. Klotz, 12 Conn. App. 570, 577, 532 A.2d 1311 (1987). In ruling on a motion to strike, the court must take as admitted all well-pled facts, and those necessarily implied thereby, and construe them in the manner most favorable to the pleader. Norwich v.Silverberg, 200 Conn. 367, 370, 511 A.2d 336 (1986).
 Fourth Count — Deceit
The Connecticut Supreme Court has repeatedly held that the essential elements of an action in common law fraud are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it: (3) it was made to induce the other party to act upon it: and (4) the other party did so act upon that false representation to his injury. Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 5, 9,540, 661 A.2d 530 (1995); Billington v. Billington,220 Conn. 212, 217, 595 A.2d 1377 (1991); Kilduff v. Adams, Inc.,219 Conn. 314, 329, 593 A.2d 478 (1991); Maturo v.Gerard, 196 Conn. 584, 587, 494 A.2d 1199 (1985). Fraud by nondisclosure, which expands on the first three of these four elements, involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak. A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment. Gelinas v. Gelinas, 10 Conn. App. 167, 173,522 A.2d 295 (1987).
The plaintiffs concede that the allegations of the Fourth Count do not specifically set forth the aforementioned four elements required to state a cause of action for fraudulent misrepresentation. They base their argument on the case ofFischer v. Kletz, 266 F. Sup. 180 (S.D.N.Y. 1967), in which the Court refused to strike a common law fraud count which alleged that before the end of 1964 an accounting firm discovered that its client's annual report contained figures that were substantially misleading and false, but did not disclose that finding to the Securities and Exchange Commission or others until May 5, 1965. The Court in Fischer relied on Restatement of Torts § 551, which provides:
 (1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from CT Page 9217 acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
 (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated
 (a) such matters as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.
 (b) any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which when made was true or believed to be so,
 (c) the falsity of a misrepresentation which when made was not made for the purpose of its being acted upon if he subsequently ascertains that the other is about to act in reliance upon it in a transaction with him.
Section 551 of the Restatement of Torts has not been cited by any Appellate Court of this State and those Courts have not addressed the issue of whether failure to disclose subsequently acquired information can be the basis for liability in fraud. This is not surprising because § 551 has no elements in common with our law of fraudulent misrepresentation. Under our law the misrepresentation must be false. Section 551 has no such requirement and, therefore, also lacks the requirement that it is known to be false at the time it is made. Our law requires the false representation to have been made for the purpose of inducing reliance. Section 551 refers to a failure to disclose which one "knows may justifiably induce the other to act or refrain from acting." In other words § 551 lacks the intent or scienter element of our common law fraud. Moreover, § 551 does not specifically require reliance by the injured party.
From the foregoing analysis it appears that § 551 of the CT Page 9218 Restatement of Torts describes conduct which is negligent, not fraudulent. Therefore, it is not surprising that the repeated reference in the Fourth Count to the defendant's breach of a professional duty suggest that this count alleges malpractice, rather than fraud.
The plaintiffs' failure to plead the Fourth Count without using the talismanic words of our black letter law of fraud does not necessarily warrant striking that Count. Nevertheless, when interpreted in a manner most favorable to the plaintiff, those allegations must satisfy the substantive requirements of BarbaraWeisman, Trustee v. Kaspar, 233 Conn. 531,539, 540, 661 A.2d 530
(1995); Billington v. Billington, 220 Conn. 212, 217595 A.2d 1377 (1991); Kilduff v. Adams, Inc., 219 Conn. 314, 329,593 A.2d 478 (1991) Maturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199
(1985), and the many other cases which set forth the elements of a fraud claim. Moreover, the plaintiffs must comply with the requirement that a fraud claim be plead with specificity. Marucav. Phillips, 139 Conn. 79, 81, 90 A.2d 159 (1952).
Even when taken in a manner most favorable to the plaintiffs, the Fourth Count fails to satisfy the first element of a fraud case, that is, that a false representation was made as a statement of fact. It is unclear from the complaint which sections of the various Andersen audits and reports prepared for the plaintiffs were false or rendered so by Andersen's subsequently acquired knowledge. The Complaint seems to describe many opinions, but few facts. For example, paragraph 23 describes Andersen's detailed financial analysis' of former Travelers properties. which "revealed that for the period January 1, 1987 to September 1, 1989 actual financial results were dramatically less than forecast." Forecasts are, by definition, opinions, and not facts. Andersen's failure to alert the plaintiffs that actual experience showed the forecasts to have been inaccurate may have been a breach of the standard of care for accountants, but it could not have been fraud. It involved neither falsity, nor a statement of fact.
The Fourth Count also fails to sufficiently allege the second element of fraud, that is, that it was known to be untrue by the party making it. For example, paragraph 59 refers to a report issued by Andersen to Colonial USA in March, 1989 in which Andersen failed to disclose that Colonial General Partners had CT Page 9219 been funding a guarantee for one of their partnerships since 1987. But the plaintiffs fail to allege Andersen's knowledge of that fact. In ¶ 25 the plaintiffs allege that "[d]isclosure of the source of limited partners' distributions would have indicated that earlier formed partnerships were funded with cash raised in subsequent partnerships. Disclosure of the source of funds used by Colonial to make distributions to limited partners and fund operating losses and cash flow deficiencies would have revealed the existence of a pyramid or Ponzi scheme whereby Colonial was using monies raised from subsequent offering to cover the obligations of previously syndicated partnerships." Again, the plaintiffs do not allege whether or when Andersen had knowledge of source of the limited partner distributions.
The third and fourth elements of a cause of action for deceit are also lacking in the Fourth Count. The plaintiffs fail to allege specifically that any of the defendant's acts or omissions were made to induce the plaintiffs to act thereon and also fail to allege whether and how the plaintiffs relied on many of the defendant's acts or omissions. The plaintiffs allege that they had signed a limited partnership agreement, and the agreement was fully subscribed before the date on which the defendant allegedly became aware of various Colonial problems. Without some specific allegation as to how they relied on Andersen's omissions, the court can only infer that those omissions came too late for the plaintiffs to have relied on them. The Complaint alleges summer of 1989" (¶ 23), September, 1989 (¶ 36). February, 1990 (¶ 37), and March. 1990 (q 38) as dates on which Andersen learned various facts which allegedly reflected unfavorably on Colonial's financial position. However, the Tamarac limited partnership was fully subscribed on December 15, 1988, ¶ 48, months before any alleged nondisclosure. For the reasons set forth above, the Fourth Count fails to state a cause of action for fraud or deceit and is ordered stricken.
 Fifth Count — CUTPA
Connecticut General Statutes § 42-110b(a) provides: "no person shall engage in unfair methods of competition and unfair or deceptive acts or practice in the conduct of any trade or commerce."
The essence of the plaintiffs' CUTPA claim is the alleged existence of a conflict of interest based on Andersen's work for both Colonial Realty and AGI and the Federman-Shuch relationship. CT Page 9220 A conflict of interest is a claim of professional negligence. SeeS.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan King, 32 Conn. App. 786, 796-97, 631 A.2d 340 (1993). In S.M.S.Textile Mills, the plaintiff brought a legal malpractice claim and a CUTPA claim against its attorneys alleging a conflict of interest arising out of the attorneys' representation of the plaintiff company and the sole owner of the company in connection with a sale of the company. The trial court granted the attorneys' motion to strike the CUTPA claim holding that the plaintiff's allegations regarding a non-disclosed conflict of interest did not provide a basis for finding immoral, unethical oppressive or unscrupulous" conduct on the part of the attorneys as required under CUTPA. Id. At 796. The Appellate Court agreed with the trial court's ruling and upheld the granting of the motion to strike.
In Haynes v. Yale-New Haven Hospital, 243 Conn. 17, 34,699 A.2d 964 (1997) the Court held that professional negligence does not constitute a CUTPA violation. The Court in Haynes stated:
 We conclude that professional negligence — that is, malpractice — does not fall under CUTPA. Although physicians and other health care providers are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession are covered, just as only the entrepreneurial aspects of the practice of law are covered by CUTPA. "Although an attorney is not exempt from CUTPA; Heslin v. Connecticut Law Clinic of Trantolo Trantolo, 190 Conn. 510, 461 A.2d 938 (1983); we made it clear in Heslin that we were not deciding whether every provision of CUTPA permits regulation of every aspect of the practice of law. . . .' Id., 520. We have held that it is important not to `interfere with the attorney's primary duty of robust representation of the interests of his or her client.' Mozzochi v. Beck, [204 Conn. 490, 497, 529 A.2d 171 (1987)]. This public policy consideration requires us to hold that CUTPA covers only the entrepreneurial or commercial aspects of the profession of law. The noncommercial aspects of lawyering — that is, the representation of the client in a legal capacity — should be excluded for public policy reasons. See Krawczyk v. Stingle, 208 Conn. 239, 246, 543 A.2d 733
(1988)." Jackson v. R. G. Whipple, Inc., 225 Conn. 705, 730-31, 627 A.2d 374 (1993) (Berdon, J., concurring).
CT Page 9221
243 Conn. at 34-35.
In Haynes the plaintiff administratrix brought a CUTPA claim against the hospital for the death of her mother who had been treated in the hospital's emergency room following a motor vehicle accident. The plaintiff claimed that the hospital had engaged in an unfair and deceptive trade practice in violation of CUTPA because it held itself out as a major trauma center yet allegedly failed to adequately staff the emergency room or train the emergency room personnel. The Court upheld the trial court's dismissal of the claim. Although it found that the provision of medical services does fall within CUTPA's definition of trade or commerce, it concluded that claims which address only the competence of a health care provider in its delivery of professional services are not covered by the consumer protection provisions of CUTPA. Instead, the Court held that CUTPA only applied to the entrepreneurial or commercial aspects of providing-medical services. 243 Conn. at 32-34.
In reaching its conclusion the Court in Haynes likened the practice of medicine to the practice of law. Only the entrepreneurial or commercial aspects of the practice of law fall under CUTPA based on the public policy consideration that `it is important not to interfere with the attorney's primary duty of robust representation of his or her client.' 243 Conn. at 35
(quoting Jackson v. R.G. Whipple, Inc. 225 Conn. 705,730-31, 627 A.2d 374 (1993) (Berdon, J. concurring). The court applied the same limitation to the practice of medicine. It is logical to extend the reasoning in Haynes to accounting malpractice claims. Accounting, like law and medicine, is a learned profession that is not interchangeable with other commercial endeavors. Deviations from the standard of care applicable to accountants are not the type of actions the consumer protection provisions of CUTPA were designed to prevent. Case law concerning accounting malpractice, the regulations of the State Board of Accountancy, and the rules of the American Institute of Certified Public Accountants more appropriately address such deviations.
Like attorneys and health care providers, accountants are extensively regulated by a state agency other than the Department of Consumer Protection. See Connecticut General Statutes §§20-279b, et seq. The State Board of Accountancy (the "Board") regulates the conduct of public accountants in this state pursuant to the authority granted to it by § 20-280 of the CT Page 9222 Connecticut General Statutes. Specifically, the Board has the authority to conduct investigations into complaints about the conduct of accountants, § 20-280c, and to impose sanctions on accountants, including fines: revocation or suspensions of licenses: censures; or imposition of probation, for committing dishonesty, fraud or negligence in the practice of public accountancy and for other enumerated misconduct. § 20-281a.
Based on the foregoing, the same limited exemption from CUTPA that applies to the practices of law and medicine should apply to the practice of accounting that is, only claims arising out of the commercial or entrepreneurial aspects of accounting should fall under CUTPA.
The Fifth Count describes the alleged CUTPA violations committed by Andersen as having occurred in `the course of its engagement' with one or more of Andersen's clients, the plaintiffs or limited partnerships of which the plaintiffs were general partners. The use of the term "engagement" underscores that the plaintiffs are merely attempting to restate their claim for accounting malpractice. The Complaint does not describe the entrepreneurial or commercial aspects of Andersen's business.
Certainly, if the plaintiffs had alleged that Andersen made fraudulent misrepresentations to them in exchange for gifts or fees from Colonial, then the entrepreneurial aspects of Andersen's business would be implicated. However, for the reasons set forth above, the plaintiffs have failed to state a cause of action for fraudulent misrepresentation. They have also failed to allege any nexus between the fees and gifts Andersen allegedly received from Colonial and Andersen's conduct with respect to the plaintiffs.
For the foregoing reasons, the Motion to Strike the Fifth Count is granted.
Aurigemma, J.